The Judges delivered their opinions.*
Judge Carr.
This is an action of ejectment. The jury have found a special verdict, of which the following abstract contains the material facts in the cause. On the 3d of March, 1787, George Bell made and published his will in due form, and died in the same year. He had (as appears from the will) a son and daughter by a former wife, and five sons by the second. To the children by the first wife, ho gives some trifling articles of personal property He lends to his wife, during life or widowhood, a tract of land particularly described, and some personal property. To his son George, he gives a tract of land, he paying to his younger brothers 30/. a piece, as they arrive at age. To his sons Nathan, ¿Ishley and ¿Inthony. he gives the balance of his land, to he equally divided among them. To these devises, there are no words of inheritance superadded; but it may be plainly collected from the will, that the testator meant to give them the fee. Then comes the clause on which this case depends. “I give and bequeath unto my son Pleasants the land which I lent to my wife before mentioned, containing one hundred and fifty acres, to him and his heirs, after the decease of my widow, or sooner if she marries, as before provided; and further my will is, that if either of my said sons, to whom I have bequeathed lands, should die without lawful issue, that the part allotted them be equally divided among the surviving brothers, children of my last wife.”
In 1804, the widow' and Pleasants sold and conveyed the land to the defendant. In 1805, Pleasants died, without marriage or issue, and the widow in 1815. The plaintiffs are the surviving brothers by the last wife. The Court below decided the matters in law arising on the ver *276 diet, to be for the defendant, and judgment was rendered accordingly; from which the appeal is taken.
The question is, what estate did P. Bell take in the land ? Was it a fee simple, with an executory devise over to the surviving brothers ? Or, was it an estate tail, enlarged by our statute into a fee ?
} Executory devises are a mere indulgence granted to men’s wills, lest the intention of the testator should be wholly defeated, and are only I’esorted to when the limitation can in no other way be sustained. Hence the rule laid down by Lord Hale in Purefoy v. Rogers, 2 Lev. 39, that a limitation, which by possibility may take effect as a contingent remainder, shall never be construed an executory devise. As executory devises tend to a perpetuity, the policy of the law has restricted them to a reasonable time; which has been settled to be a life or lives in being, and twenty-one years after. Unless they are so limited that the event on which they depend must happen within this period, they are void in their creation. Thus, a devise to A. and his heirs, and if he die without issue living at his death, then to B and his heirs, is an estate in fee to A. with an executory devise to Band the devise to B. is good, because the event which determines its existence or non-existence, is B’s death. So, if in any other way, it appear by “fair demonstration,” that the testator intended to limit the dying without issue to the period established by law, the executory devise will be valid. But, a devise to A. and his heirs, and if he die without issue, to B. and his heirs, can vest no estate in B. by way of executory devise; because, coming after the estate tail in A. it may take effect as a remainder; and even if this objection did not exist, it would be void as an executory devise; because, being limited after an indefinite failure of issue, it is too remote. In England, estates tail may be destroyed by fine and recovery; with us, by statute. In jjaither case, the remainder falls with the particular estate .which supported it. But if, instead of a remainder de *277 pendant on an estate tail, it be an executory devise after a fee simple, it cannot be affected either by the fine and rocovery of the tenant, or the operation of our law. Heneo the struggle so often repeated in the English Courts and ours, between the alienee, heirs or devisees of the first taker, and those who claim as executory devisees.
In our case, after giving each son a fee simple in his land, the testator says, si My will is, if either of my sonr, should die without lawful issue, that the part allotted them be equally divided among the surviving brothers, children of my last wife.” What did he mean ? Did he look to a definite, or indefinite failure of issue in the first takers ? It seems to me clear, that he meant that the land given to each son should be enjoyed by tho family of that son, so long as any branch of it remained; and that whenever it failed, the land should go over. That he meant the, issue of the first taker to enjoy tho land, so long as they larded, is directly and positively declared. Why should he fix an earlier period, than the failure of this issue, as the epoch at which the second limitation should be determined? l\ Bell and his immediate family, were the first objects of his bounty, his other sons and their families, the second. Why should he fix the period of Pleasunts’ death, as the moment at which, if his brothers could not take his estate, they never should take ? Suppose P. Bell had loft a child at his death, and that child bad died the day or the hour after him. Did the testator mean, in such a case, that his other sons should have no part of, or interest in, P. Bell’s land ? I can neither feel nor understand the motive, which could prompt a father to this. Why he should postpone the interests of his other sons to the failure of tho issue of P~ Bell, I can clearly sec-; but, 1 cannot perceive why ¡•¡me should be so important with him, as that he should say to his other sons, “ though it is uiy will that you have the land of P. Bell if he has no child at his death, yet if he leave a child, you shall not have it, though that child die the next hour.” If he had had this idea in his mind, *278 would it not have been more natural and direct to have said, ££It is my will, that if either of my sons die without issue living at his death, his part shall be equally divided among his surviving brothers ?”
It is insisted, however, that express words are not necessary to tie up the failure to the death; that any words which make the intention clear are sufficient; and that those used here, leave no doubt of the testator’s meaning. The words are, that the part of the son dying without issue ££ be equally divided among the surviving brofhers, children of my last wife.” Great reliance was placed on the words “surviving brothers;” but the word survivor, is not a word of limitation. Dying without issue, have been long settled as words of limitation, giving an estate tail. The (question is, do these words, surviving brothers, indicate so strong an intention to tie up the failure of issue to the death of the first taker, as to prevent the words dying without issue, from having their settled meaning and effect ? There are numerous cases upon this subject. I shall not attempt to cite them all; nor to reconcile them with each other. I will state a few to shew the ground on which I rest, in thinking that the words surviving brothers have not the effect contended for.
Chadock v. Cowley, Cro. Jac. 695, decided four years after Pells v. Brown, and by three of the same Judges. The testator devised all his lands in B to Thomas, his son, and all his lands in E. to F. his son; and added, Item, I will that the survivor of them shall be heir to the other, if either die without issue.” Held by all the Judges (absenté Lea, C. J.) that it was an estate tail in Thomas.
In Hope v. Taylor, 1 Burr. 268, R. S. devised to J. W. his sister’s eldest son, his house in the brook with the out buildings and 30l.; to his nephew R. T. 50l.; to his nephews C. T, R. T., W. 71, 29 acres of arable and meadow land, &c.; then to FV. T. his sister’s son, the house in question, and gives him also 10l.; to his brother-in-law, W. T. 5l.; and declares his will and meaning to be, that *279 II either of the persons before named die without issue lawfully begotten, then the said legacy shall be divided equally between them that are left alive, Lord .Mansfield and the whole Court decided, 1st. that the word legacy comprehended the land as well as the personal estate mentioned in the will; 2d, Lord Mansfield said, the testator meant this second clause as a restraint on the first, and meant, that the issue should have it; and the whole Court decided that an estate tail was given.
In Roe v. Scott & Smart, decided in C. P. 27th George 3d, 2 Fearne, 209; testator devised certain lands to his son James, to him, his heirs and assigns for ever; other lands to his son John, to hold to him, his heirs ami assigns for ever; other lands to his son Thomas, to hold to him and his heirs and assigns for ever; and after charging the land of Thomas with an annuity, added, that his will and mind was. that if either of his three sons should depart this life without issue of his or their bodies, then the estate or estates of such sons should go to the survivors or survivor¡ and if all his said sons should happen to die without such issue, then he devised all the said premises to his four daughters, their heirs and assigns for ever. Held, that the sons took estates tail. It would be difficult to distinguish this case from the one before us. They are alike in all their- branches; the fee given to the three sons: then if either die without issue, his estate to the survivor or survivors. If it be objected, that the. word estate here ope, rates to carry the fee to the second taker; I will shew presently that our caso has this feature also.
In Barlow v. Salter, 17 Ves. 479, the devise was in these words: "All my estate, real and personal, to my daughter, M. V, to her and her heirs, and half the navigation money for her natural life; and in case she dies without, issue, all to be divided between my four nephews ami nieces, N., W., C. and Eg C’s part only for life, and her part to be divided between the survivors.” The hill war. filed by one of the nephews again,si, the daughter, praying *280 that the nephews and nieces might be declared entitled on the event of the daughter’s dying without issue living at her death, and praying an account accordingly. It was admitted that there was no real estate; and this makes the case the stronger; for, it is well known that slighter words will be taken to tie up the failure to the death, in personal than in real property. The Mastek of the-Roees went into the consideration of the words “ in case she dies without issue.” The Judges in some of the early cases, he said, had inclined to hold these words to mean issue at the death of the person named; but, he thought that ever since the case of Beauclerk v. Dormer, a different rule had prevailed. “The Court ought not certainly to profess to adopt one of these rules, and yet to proceed as if the other was the right one; which however is done, where the meaning of the words is held to be narrowed by expressions or circumstances that do not raise any fair inference of a restrictive intention. The single circumstance in this case relied on in favour of the restrictive construction is, that one of the four persons to whom the bequest over is made, is to take a life interest in her part, which is to be divided equally among the survivors.” In a further'part of his opinion, he observes that the word “survivors as used here, has the same sense as the word others, as has been frequently decided.” He concludes by pronouncing it an estate tail in the daughter, and dismissing the bill.
Let us come now nearer home, and examine some of the decisions of this Court. If I mistake not, we shall find that they settle this question even more conclusively than the English cases.
Carter v. Tyler, 1 Call, 143. Will made in 1759. “ My will is, that my son W. C have all my lands” (describing a particular tract,) “to him and his heirs lawfully begotten, for ever, &c. I give to tpy son J. C. all the remaining part of my land,” fee. (describing the tract,) “to him and his heirs lawfully begotten, for ever; and if either of my sons should die without issue, my will is that the whole *281 gi> to the survivors and if they both die without issue lawfully begotten, then my will is, after my wife’s death, that the lands be sold, and the monies thereon be equally divided between my daughters then living, and their heirs forever.’5 I consider this a ease deserving the utmost weight. It is the first we meet with in our books, after the passing the laws docking entails. It was decided by the unanimous opinion of the Court, consisting of Pen-am-ros, Lyons, Carrington, Fleming, and Roane. These venerable and able men were actors in those eventful scones, which gave birth to these laws; some of them, probably, members of the Legislature which passed the»!. The cause was argued with great learning and ability by the most distinguished counsel then at the bar. Mr. Call, and Mr. Washington, put forth all their strength to prove that the limitations over were not destroyed by the statutes. The ground was taken very strongly, that they were executory devises. But the Court, in a clear, forcible, and decided opinion, delivered by their President, pronounced that the sons took estates tail, and that the 'limitations over were void.
Lei us examine for a moment the points of resemblance between this case, and the one at bar. I think we shall find, that it contains much stronger evidence than ours, of an intention to tie up the failure of issue to the death of the sons. 1st. If one of them die without issue, the whole goes to the survivor, without any words of inheritance .superadded. 2d. If both die without issue, then, after my wife’s death, the lands to bo sold. Here is a provision which shews that he thought the event he was contemplating, (the death of his sons without issue,) might occur in the life of their mother; strong to evince that it was not an indefinite failure of issue. But, this is net all. Ui- The lands were to be sold, and the monies thereon to be £e equally divided among my daughters then living and their heirs.55 When living? Why, living at the death of the sobs without issue, asd of the mother. If she *282 should survive them. To me this appears vastly stronger than the case at bar, to shew an intention to restrain the failure of issue to the death of the sons; and yet a full Court unanimously decided against the executory devise. This decision was made in 1797, near thirty years ago. It has never been questioned, but often referred to by the later cases as authority. If we now overrule it, who can tell how many titles, resting on the basis of this very de» cisión, we may shake to their foundation ?
The next case is that of Hill v. Burrow, 3 Call, 342, decided in 1803. The contest was renewed upon the old battle ground; whether it was an estate tail, or a fee with an executory devise limited upon it. The intention of the testator, and its decisive weight in the construction of wills, were strongly pressed; and Porter v. Bradley, Roe v. Jeffery, and that whole class of cases brought before the Court. They were again unanimous in their decision, that it was an estate tail. Judge Lyojss has the following sound and pertinent remarks.* “ It is to no purpose to be arguing about the intention, unless the words will authorise a restricted construction; for, mere intention cannot prevail against a settled rule of interpretation, which has fixed an appropriate sense to particular words; because, when the sense is once imposed, they, become the indicia of the testator’s mind, until the contrary is shewn by countervailing expressions. It is better that it should be so too; for, the law ought to be certain; and where the rule is once laid down, it should be adhered to. Otherwise, what is called liberality at the bar, will degenerate into arbitrary discretion, and all depends upon the will of the Judge.” He adds, “An infringement of the rule, instead of supporting the Legislative intention, would go directly to defeat it; and would tend, under the notion of executory devises, to introduce that very clog to alienation, which the statute meant to abolish.”
The case of Tate v. Tally, 3 Call, 354, followed soon after. The words of the devise were nearly the same; *283 but. the will was made after the Act of 1776, and this furnjsiied to the ingenuity of counsel a ground of distinction at least plausible. Mr. Wickham pressed this point with great power. He argued, that hi .England estates tail Were implied for the benefit of tho issue: that hero such implication would have exactly the contrary «fleet: that a devise of Umd< since 1776, should be placed on the same ground with personal estate; because, the first devise will now give the whole estate in lands as in personals; and the implication would disappoint the intention of the testator. The Court, however, held fast to the former decisions, pronounced it an estate tail, and that the construction must be the same since as before the statute.
Next comes the case of Eldridge v. Fisher, 1 Hen. & Munf. 559. Will in 1784. Devise of laud and personal estate to his son and his heirs, and if he die without lawful heirs, to the grand-son of the testator. Tho counsel for the grand-son, in whose favor the Court below had do-«sided, said that after the former decisions he should surrender the case, if it did not present an important distinction. Real and personal estate were devised by the same words in the same sentence. The whole Court considering the case settled, decided the estate of the first taker to be an estate tail, and reversed the judgment of the Court below.
Sydnor v. Sydnor, 2 Munf. 269. Will in 1779. Testator gave to his four sons a tract of land each, to him and his heirs for ever. cs And it is my desire, that if any of my four sons should die without heirs of their bodies, that then the parts of them so dying, shall be equally divided among the survivors and their heirs.’5 One of the sons died without issue, and devised his land to a nephew. The surviving brothers sued for it; and the Court below, on a special verdict, decided the law to be for them. On the appeal, great reliance was placed on the word survivors, and the whole doctrine again gone into. The Court unanimously (Flbmxstg, Roane, Brooke and Cabell,) const *284 dered it a settled case; and without delivering opinions, re versed the judgment of the Court below. I consider this a ease strongly in point. The only imaginable distinction between it and the case at bar, is, tiiat there the devise is to the survivors and their heirs; in our case, to the survivors, without words of inheritance superadded. But to me, this seems a distinction without a difference. For I hold, that in this case equally as in that, the survivors were intended to take, and would take, (if they took at all) a fee simple. Because, in the commencement of his will, the testator declares his intention of disposing of his worldly goods; and we know that these words, and others of the like kind, will, in favor of intention, and to prevent a partial intestacy, be transposed to any subsequent devise in the will, and make such devise as effectual in carrying the fee, as if words of inheritance had been used. For the reasoning and authorities on this subject, I refer to Goodrich v. Harding, 3 Rand. 280.
The other cases in our books on (his subject, are M’Clintick v. Manns, 4 Munf. 328; Tidball v. Lupton, 1 Rand. 194; Kendall v. Eyre, 1 Rand. 288, and Goodrich v. Harding, 3 Rand. 280. These cases are in perfect harmony with the former, and present an unbroken series of decisions for the last thirty years. Surely this ought to settle the law.
As to the idea that the law of 1819, is an expression of the Legislative opinion, that the Courts have heretofore decided wrong on this subject, and furnishes us with a fair opportunity to break the toils in which former decisions have bound us, I would remark, 1. That it is not the province of the Legislature to censure the exposition which the Courts give to any law; nor ought we to impute to them, on slight ground, such usurpation; 2. That the words of the Act imply no such censure; but acknowledging the existing law to be as settled by the Courts, mean merely to change it for the future; saying that in a will or deed hereafter made, a contingent limitation depending upon (he *285 «lying of a person without heirs, heirs of the body, issue, issue of the body, &c. shall be hold to take effect, when such person shall die without heir, issue, &c„ living at the time of Ms deaths OT born within ten months. This law is entirely prospective. The Legislature have justly thought, that to give it an ex post facto effect, would be wrong. Shall the Courts then give it such operation ? So far from this law furnishing a fair opportunity to overturn the settled course of decisions, I think it shews us the propriety of a different line of conduct, of leaving this subject exactly where the law has left it The great advantage which a change of the law by the Legislature, has over a change by the Courts, (even if this could properly be done) is, that the one is a public rule, binding all alike, and looking to the future only. The other is a rule, which, as the Court makes, it may break; and which affects past, as well as future cases. For the last century or two, dying without heirs, issue, &c. has been settled to mean, a general failure, not tied up to the death of the first taker. If we say now, that these decisions are all wrong, will not our successors have more right to reverse our decision, than we have to reverse one with the frost of centuries upon it ? But our decision will be retrospective; for, as we do not assume the power of makings but only declaring, the law, if we say that these decisions are wrong, all the estates which have been settled, all the contracts which have been made, all the titles which rest on the foundation of their correctness, are uprooted. Nor can we see the extent of the mischief. A few cases only have come before us, for some years back; because, the law being settled, counsel would generally advise against it. But, only open the door; proclaim to the world that all which has heretofore been done is wrong; and then wer shall see the wild uproar and confusion among titles, which will follow. Is it not better to prevent this, by holding on in the course we have so long ran? The cases which arose prior to the law of 1819, must cease after a time; and then that law settles the matter.
*286 Judge Green.
If in this ease, the limitation over to the surviving brothers of Pleasants Bell, had been to them and their heirs, no question could have been raised, that the intention of the testator to provide for the issue of Pleasants indefinitely, so long as any existed; and upon the general failure of his issue, for his brothers and their heirs, would have reduced the express estate in fee given to Pleasants, to an estate tail, for the purpose of effectuating this general intention, which could not, upon any other construction, be carried into effect. It would be precisely the ease of Sydnor v. Sydnor, 2 Munf. 269, over again. In that case, it would be immaterial to determine, whether the testator intended by surviving brothers, all the other brothers; a meaning sometimes given to the word survivor; or whether he intended only, such of the brothers and their heirs who survived Pleasants, to take. In either case, the limitation over would be a remainder after the estate tail; in the first case, vested, in the other, contingent; and in both, defeated by the operation of our statute converting estates tail into absolute estates in fee simple.
It is however insisted, that as the law was before the 7th day of October 1776, the limitation over to the surviving brothers, without the words and, their heirs, or any other words of perpetuity, gave them only life estates, upon the contingency of their surviving Pleasants; and as that contingency must happen within a life or lives in being, the limitation over could be supported as a good executory devise; and therefore, there is no necessity to reduce, by construction, the express estate in fee given to Pleasants, to an estate tail, in order to effectuate the intention of the testator. This would be true, if there was nothing to prove that the limitation over to the surviving brothers was a limitation of the fee, and if the case of Roe v. Jeffery is law, of which I doubt. It may however, be admitted as law, for the purpose of this case. In enquiring *287 whether the limitation over was of an estate in fee, I pass over the effect which tho introductory clause of the will may have upon this question, and put it entirely upon the force of the Act of 1785, which took effect on the 1st day of January, 1787, and provided that. Sl every estate in lands which shall hereafter be granted, conveyed or devised to one, although other words heretofore necessary to transfer at? estate of inheritance be not added, shall be deemed a fee simple, if a less estate be, not limited by express words, or do not appear to bo granted, conveyed or devised, by construction or operation of law.53 The will being made, and the testator having died in 1787, after this Act was in force, the statute is decisive, that the surviving brothers took a fee, if any estate; and Pleasants, therefore, an estate tail, unless we are not at liberty to take into consideration the effect, of this statute, in determining whether Pleasants took an estate tail or not. This question has an important influence in the construction of wills made since the 1st day of January, 1787, and before tho 1st day of January, 1820, when the Act respecting executory limitations took effect, and ought therefore to be at once decided.
Estates tail wore unknown to the common law. They were created by the statute de donis c<mditionalihust which provided, is voluntas donationis secundum for-mam in chart a doni sai manifesté ewpressam de costero ohservettir.,> In executing this law, it was the duty of the Court to ascertain from the whole will taken together, whether the intent of the testator was to provide for the issue of She first taker; and if so, without ¡regard to the particular estates given in terms by the will, to bold that the first taker had an estate tail, if the issue could not otherwise be provided for, according to the intention of the testator. Thus, an express estate for life or in fee was converted into au estate tail, if that were necessary to effect this intent in favor of the issue. But, if not absolutely necessary for that purpose, the estate expressly given was *288 not disturbed. This statute was in force in Virginia, from the first settlement of the country, until the revolution; was adopted by the ordinance of the convention of May, 1776, 'v'di all other British statutes in aid of the common law prior to the 4th year of James 1st, as the law of Virginia; and continued in force until December, 1792, when it was repealed with all other British statutes. The statute de donis was in force when the will in question was made, and when the testator died; and if no other statute had any influence on the question, the Act of 1785 must have had a decisive influence on its construction. In England, and in Virginia, before the Act of 1785 took effect, a devise to one in fee, and if he died without issue, then to another and his heirs, was construed to give to the first taker an estate tail, notwithstanding the express estate in fee given by. the terms of the will; because, it was apparent that the testator’s intent was to provide first for the issue of the first taker, and after that, for the second taker and his heirs; both of which intentions would be frustrated, if the first taker had a fee simple estate, since in that case the issue could claim nothing per formam doni, and the limitation over would be void, as being a fee mounted upon a fee But, the Court did not, by construction, destroy the express estate in fee given by the will, unless there was such a necessity for the sake of effectuating the testator’s intention. If, therefore, he directed the estate to go over to another upon the death of the first taker without issue then living, there did not appear so decisive an intent in favor of the remote issue of the first taker; and the limitation over could take effect, in the event provided for, as an executory devise, and the testator’s intent in that respect carried into effect. The express estate in fee, therefore, was not reduced by implication to an estate tail. Upon this principle, a limitation over of an estate for life was held to be a good executory devise, and not to affect the fee given to the first taker; and a limitation to one, without words of perpetuity, was, in effect, the same as are *289 express limitation for life. In that ease, if there were no ultimate limitation over of the fee, the heir of, or the purchaser from, the first taker, would be entitled to the estate iu fee simple, after the estate for life expired.
After the 1st of January, 1787, a limitation over without any words of perpetuity or limiting a smaller estate, gave a fee; and the reason, upon which a limitation over for life was held to be good as an executory devise, no longer existed. Every reason, upon which it was thought necessary to limit the estate of the first taker to an estate tail, when, the limitation over was in fee, would apply to the case arising under the statute. Can it be for a moment supposed, that if a statute like ours of 1785, was passed in England, it would not have this effect upon the construction of wills there ? If it had not, the most, extraordinary-consequences would follow. The person to whom an estate was given after the failure of issue of the first taker, upon the argument that he was only entitled to an estate for life, having gotten the estate on that ground, would be entitled to it in fee; whereas, if he was ‘only entitled in reality to an estate for life, the fee would remain to the heirs of the first taker, or the purchaser from him. In other cases, other consequences as absurd as this would arise. Loddington v. Kime, 1 Salk. 224. Thus a devise to «/£. who has no child, for life, and then to his issue and their heirs, if he should have any, and if he die without issue, then to B. and his heirs; >fl. would be entitled to an estate for life only, with remainder in fee to his issue as they came in esse, if he had any; and if not, then remainder to B. and his heirs. 3 Salk. 126. But, If the devise was, before the Act of 1785, to B. for life, and to his issue if he have any, and if he die without issue, then to B. and his heirs; J3. would have an estate tail, with remainder in fee to B. In both eases it is apparent, that the testator meant to give only a life estate to Jl., and provide for the issue of <7?., as long as he had any; and then for J?. and his heirs. In the first ease, all those ob *290 jects are effected by the estates expressly given by the tes tator, because the estate given to the issue of A. is a fee,. But in the other, an estate for life only being given to the issue of A., the testator’s object of providing for A’s remote issue, would be frustrated, unless A. was held to have an estate tail; by which, all the testator’s intentions would be carried into effect, except only that, of limiting an estate for life to A. Suppose, after our statute of 1785, we refuse to apply the rule prescribed by it to a case like the last stated. 7’hen the estate tail of A. raised by implication, being converted by our statutes into a fee sim - ple, the intention of the testator, both as to the issue of A. and B., and the estate of A. would be utíerly frustrated. But, apply the rule furnished by the statute, and consider the issue of A. to be entitled to a fee simple; and the testator’s intentions as to A. and the issue of A. and as to B and his heirs, would'be carried into complete effect, without defeating any part of his intentions. It is hardly possible, that any Legislative provision could have been intended to produce such consequences. Let us examine the only statutes, which can possibly be supposed to pro» hibit the Court from giving effect to the Act of 1785, ic construing a will with a view to ascertain whether it created an estate tail or not.
The Act of October 7, 1776, only declared, that S6any person who then had, or thereafter might have, an estate tail, should, from thenceforth, or from the commencement of such estate tail, stand ipso facto seised in full and absolute fee simple.” The Act of October, 1785, ch. 63, provided, that11 every estate which, on the 7th of October, 1776. was an estate tail, shall be deemed from that, time to havq been, and from thenceforward to continue, an estate in fee simple; and every estate which since hath been limited, on hereafter shall be limited, so that as the law aforetime was, such estate would have been an estate tail, shall also be deemed to have been, and to continue, an estate in fee simple.” The expression as the law aforetime was, re *291 sers to the law as it was before the 7th of October, 1776, when the Act converting estates fail into fee simple estates, passed. This is the literal import of the words; and so they »vere understood by the Legislature at the; rovisal of 1819, in which the revised Act refers expressly to the law as it was before the 7ih of October, 177(5. Was it intended by this expression to refer to all the particular decisions in England and Virginia, anterior to the 7th of October, 1770, is the rules for decision in all future time, without, regard to the effect which futuro laws might have upon the reasons, on which those decisions "were founded ? Or, to adopt the principles upon which those decisions were founded? The decisions before that time were founded upon the principle, that where the intent of the testator was to provide indefinitely for the issue of the first taker, and that object could not be effected without implying an estate tail in the first taker, such an estate tail must be implied, although it controlled the will of the teat at or in respect to the particular estates given in terms by hi; will. This necessity to imply an estate tail, not given in terms, arose sometimes from the existing law of primogeniture, which would defeat the intent to provide for all the issue, unless the first taker was construed to take an estate tail; sometimes from the effect of the then existing law requiring words of perpetuity to give more than an estate for life; by force of which, the immediate issue of the first faker would be limited to an estate for life, unless the first taker took an estate tail. But, when the law of primogeniture was abolished, and all the issue admitted to participate in the inheritance, and an estate in fee was allowed to be given without words of perpetuity, by our statutes, the reason opon which the former decisions, turning on these points, were founded, was taken away. By preserving the ancient principles, and applying them to this new state of things, the results would he different; but in both cases, conforming, as near as possible, to the main intentions of ihe testator to provide for the issue. When the Act of *292 1785 was passed, the statute da donis was still in force; and by the expression as the law aforetime was, the Legislature could not have intended to say, that an express estate tail should be construed to be an estate tail; but it was easy to foresee, that when a question arose whether an estate tail should be implied or not, it might be argued that, as an estate tail could not exist after it was implied, there could be no motive for implying it; and that, therefore, no such estate could be implied since the 7th of October, 1776; an argument repeatedly urged since, and overruled. It was to obviate this objection to implyingesfaf.es tail, and for this purpose only, that the act declared that those estates which would have been fees tail as the law aforetime was, should be deemed estates in fee simple. It was absolutely necessary to declare, that estates tail might be implied from the intent of the testator to provide for issue, in order to effect the object of the Act of J.776, which was to give to the first taker the power of providing for his issue by giving them the estate, without compelling him to do so, wherever it appeared that the testator intended to provide for the issue; a policy which might frequently be frustrated, if an estate tail could not be implied. As if a devise were to A. for life, and if he died without issue, then to B. and his heirs, the obvious intention of the testator that the issue of Jl should take, would be frustrated, unless dPs life estate could be enlarged to a fee tail (converted by the statute into a fee simple,) by implication: For, in no other way could they take any thing in any possible event.
This construction would have prevailed upon the statute of 1776, if the Act of 1785 had not expressly prescribed it. That Act prescribed it from excessive caution; and upon the whole, I think the rule prescribed by the Act of 1785 was, that an estate tail should be implied, whenever under our existing laws, it was necessary to do so, in order to effectuate the intention of the testator in respect to the issue; the Act adopting for that purpose the reason *293 of the law, and not the particular cases decided before the 7th of October, 1776; and that upon the reason of the law.
Pleasants Bell had, in this case, an estate tail, and not a fee, by force of the will; or, if he had an estate in fee simple by the will, the limitation over to his surviving brothers was in fee, and therefore void.
Judge CoALTER.
This ease ar ises on the will of George Bell, made on the 3d of March, 1787, and on which will these questions arise;
Í. Whether Pleasants Bell took an estate in fee with remainder to his surviving brothers, which, by the Act of 5 785, must be in fee, although no words giving a fee are in the will; and is that remainder limited on the contingency of a dying without issue at his death, so as to be good as an executory devise ? Or,
2. Wag it intended to give an estate tail to Pleasants Bell, which would be the case if an indefinite failure of issue was intended ?
It is said to be an established rule, that when a devisa is to and his heirs, and if he die without issue, or to him generally, and if he die without issue, it is an estate tail; and that this rule does not yield except to express declarations to the contrary, or to effect some obvious intention in his mind at the time. On the other hand it is said, that the happening of the contingency need not be tied down by express words; but, if it appears from the whole will together, it is enough; that this is a good limitation, at least according to the more modern decisions in England, and at all events, would be a good limitation of a personal subject; and that however it may be, if an estate is given to one for life, and if he die without issue, as to inferring an estate tail, it is not so easily to be inferred when the first taker has an express fee by the will.
The difference between a will of real and personal property. in. relation to estates tail by implication, is stated *294 by Judge Pendleton in his clear and plain manner, in the case of Dunn v. Bray, 1 Cáll, 294. He says, cases have been cited to prove that in a devise of lands to one for life or in fee, and if he die without issue, remainder over, &cc., this would turn the first estate into an estate tail, in order to favor the testator’s intention of preferring the issue to the remainder-man; but in principle, the distinction, in case of personal property, is clear, since the implication in the case of lands to favor the intention, would be misapplied, if made use of to destroy that intention in the ease of personals.
Our Act of 1776 docking entails, and the Aet of 1785 reenacting that, and also dispensing with words of inheritance, introduced an entire new state of things in this State, on this subject. Lands were put precisely in the situation of personal property, not only as to the want of power to entail them, but as to the quantity of the estate taken, where no estate less than an absolute one is limited. Under this state of things it was reasonable to expect, that the Courts would have construed wills of lands and personals, made after 1776, alike. It is said, however, that not only the Acts of 1776 and 1785 themselves, but our decisions under them, have tied us down to construe wills as to real estates made since 1776, in the same manner as if estates tail could now be made; that is, that notwithstanding the essential change in the condition of testators here, we are to decide on their wills, as if made in England under their statute de donis; and that although we are thus not to permit the absence of power to make an estate tail, to weigh in the construction of wills, yet, on the other hand, we are not prohibited, either by the statute, or our decisions, from looking at the other part of the system, by which realty and personalty are put on the same footing, to wit, that part of the statute, by which an absolute estate passes,.Sinless where a less one is limited; and therefore we are to take that part of the Act into view, though not the other. Indeed it seems to me even to be insisted on, *295 ■.that we shall construe a will oí- lands, as if the words to him mid his heirs, wherever they are supplied by the statato, were actually io the will. But the presence or ab« sence of such words in a will of personals, has a great effect on the construction, when enquiring into the intent, in relation to the time when tho'contingency is to happen; though it will not affect the quantity of the estate given.
If, however, the Acts themselves oblige us to adopt the course of construction insisted on, as it regards one branch of the system, I cannot perceive why they shall not extend to the whole. The law dispensing with words of inheritance, is no more law aforetime, than that destroying entails. Whether wo are to consider that part of the Act of 1785, dispensing with words of inheritance, in connection with this will, is, therefore, the point now to be decided, in the first place; because, if we arc not, but are to consider this will in the same manner in this respect, as if it was made before the Act. of 1785 went into operation, then the case of Goodrich v. Harding, and uiany other cases in England and here, (it seems to me at present,) seems sufficient to support this as a good executory devise. The point noto under consideration, seems purposely to have been loft open by at least two of the Judges in that case.
It seems to sue at present, then, that if either the Acts themselves, or the decisions of this Court, bind us down to construe wills of lands, independent of the change I,r: our condition wrought by those very laws, that we are bound throughout. The change in placing realty on a level with personalty, as to the power of entailing, was no less important as applicable to construction and finding out intent, than the change as to words of inheritance;; and indeed, to my mind, much more so; and being part of the very same law, if we are inhibited from viewing or weighing the effect of the one, wo must be bound also as to the other. There is tho same reason too, for breaking through the decisions in iota, as for doing so in parto Indeed store so; for. looking at a part only of the system *296 may even lead to greater errors, than shutting our eyes In the whole.
What is the law, and what have been our decisions on this subject? And how far are we to be bound, especially since the Act of 1819, to construe wills in this country, as they do wills in England ? This, to me, is a momentous question, especially since the Legislative construction by the Act of 1819. Do the Acts themselves of 1776, and 1785, tie us down to decide as if we were sitting in Westminster Hall, judging of a will made in England ? It is said, (and the idea has met with the approbation of at least some of the Judges of this Court,) that the use of the words, as the law aforetime was, in the Act of 1785, as well as the phraseology of the Act of 1776, do so confine us. This idea, I humbly, and with great deference think, is not well founded; and that, therefore, if we have erred in this respect, we cannot impute it to the Legislature; and consequently, if an erroneous supposition that the law imposed this duty on us, has led us into this error, it becomes a matter of serious consideration what course we ought to pursue. Were we bound by lato, as it is said we were and are, to adopt and pursue this course of decision ?
This leads to the enquiry, how and for what purpose, these words were introduced into the Act of 1785 ?
Before the statute de donis, all inheritances were estates in fee simple or fee conditional. Tenant of lands entailed had before this statute a fee simple conditional subsequent; and although he had issue, he had not thereby a fee simple absolute; for, if he afterwards died without issue, the donor could enter in his reverter. 1 Inst. 13. But after issue, be could aliene, so as to bar him; and as well before as after the issue, he could aliene, so as to bar his own issue. The object 'of the statute de donis was to restrain this right of alienation, which operated to the disherison of the issue of the donee, and to the exclusion of the donor from the reversion; both oí which was contrary to the will of the-donor, and against the form *297 of the gift. In carrying this law into effect, the Courts clodded that the donee should not have 8 fee simple con» ditional as aforesaid; but, they_divided the estates, and created a partículas* estate in the donee, and a reversion iu the donor, so that, the- donee could not, by alienation, bar his issue or the donor as aforesaid. Thus it is, that tenant in tail is said to be by virtue of this statute. The power of alienation, however, was afterwards given by statute, if made by fine and recovery.
The Act of 1776, then, did not repeal the statute de do« nis, bul only provided that any person who now hath, or hereafter may have, an estate in fee tail general or special, &e. shall, from henceforth, &c., stand seised, possessed, &e., in full and absolute fee simple, 8i.c. as if the conveyance had been in feo, &c. The party was not thereby thrown back on his fee conditional at common law, although the statute de donis might be said to be virtually or substantially repealed. It was permitted, as it were, io remain in force, merely for the purpose of enabling tenant in tail to hold the fee absolute and unconditional under this Act.
The Act of 178S, els. 62, then takes up the subject, and declares, that i( every estate in lands, &c, which, on the 7th of October, 1776, was an estate in fee tail, shall be deemed from that time to have been, and thenceforward to continue to be, an estate in fee simple; and every estate in land, which since hath been limited, or hereafter shall be limited, so that, as the law aforetime was, such estate would have been an estate tail, shall also be deemed to have been, and to continue an estate in fee simple; and all estates which, before the said 7th day of October, 1776, by the law if it remained unaltered, would have been estates in fee tail, and which now, by virtue of this did, are and will be estates in fee simple, shall from that time and henceforth be discharged of the conditions annexed thereto by the common law restraining alienations before the donee shall have issue; so that the donees, or persons in whom the etui* *298 ditional fees vested or shall vest, had and shall have the same power over the same estates, as if they were pure and absolute fees.” Then follows the clause dispensing with words of inheritance in creating a fee. It is plain to be seen by this latter part of the clause concerning estates tail, that if it had either been suggested, or there was some fear entertained, that the Act of 1776, having virtually abrogated the statute de donis, it might be supposed that the common law conditional fee was revived, and stood as before that statute; and the case of Carter v. Tyler, 1 Call, 165, is perhaps'sufficient to shew that this idea is not without foundation. The words, therefore, “ as the laiv aforetime was,” I humbly conceive, had reference to the fee tail as created by that statute, to be adjudged of as if that statute was in force. This idea is fortified by the words of this second member of the clause, which declares, that all estates which, before 1776, “by the law if it remained unaltered, would have been an estate in fee tail,” &c. What law is supposed here to have been altered ? Surely the statute de donis, and possibly the common law as to conditional fees. But if they both had not been virtually repealed by the Act of 1776, the Legislature, by this very Act of 1785, did expressly alter or abrogate them both by this second clause, so as to make estates which, by the law aforetime, were either fee tail or fee conditional at the common law, absolute fees. For these reasons, then, those expressions were deemed necessary and proper, and not for the purpose of laying down rules for the interpretation of wills or deeds, or to bind the Court down, in its search after the intention, to decisions and reasons, which, by the very Act, were rendered inapplicable. There was not, and could not be, any wish in the Legislature, to create estates in fee tail, contrary to the will of testators, so as to convert them into fee simple estates. There never has' been any hostility to those limitations for family purposes, which are to take effect within the reasonable time prescribed by law. On the contrary, the Act of 1819 is a complete Legislative *299 declaration, that the course of decision which has so long done violence to the wills of testators, by applying rules of decision hora, which do not exist in England, (for there, where a fee tail cannot exist, their rule is, as 1 contend it ought to be here,) is no part of the Legislative will, but the reverse. Why has the Legislature by that Act said, that a limitation made so and so shall be good, unless it plainly appears that such was not the intention ? Was it Intended thereby to vest a different estate than was intended ay the testator, as is done when an estate tail is converted into a fee ? Surely not. It was to restore to wills their real and intended effect; to adopt the construction that no man ought to be supposed as intending to create an estate, which cannot exist by law, unless it manifestly appears that such was the intention.
Suppose a testator should preface his will by stating that ho was without counsel, and unacquainted with the technicalities of law, and of Courts; but, that he knew he could not create an estate tail, and also, that a fee would pass If he did so, and ho would be thereby defeated in certain provisions which he wished to make for his children and their descendants, for family purposes, and to keep '.he estate In his family as long as he could, without the violation of any law; and therefore hoped that his will might be fairly construed and supported, unless it plainly appeared that he had attempted to create an estate, which the law did not authorise; and a will, such as the present, and sueh as this Court is in the habit of deciding on, so prefaced, was submitted to us to decide what meaning was to he put on it. Could any other be put on it, than such as the Act of Assembly of 1819 aforesaid, has prescribed ? But, is not this, In fact, the appeal which every testator, since the Act of 1776 was generally known to be in force, makes to this Court ?
I once heard of a Scotchman, who, having acquired a good deal of property, had occasion to leave the country; but, before doing so, made his will. Not being heard of *300 for a long time, probate was taken of the will, supposing him to be dead. After some fifty years, a suit, depending on the construction of the will, was argued and about to he decided. An aged stranger attended the argument and decision; after which, he arose and told the Court that whatever they might say to the contrary, when he wrote and made that will, he intended so and so; very different from what the Court had decided. Could all the testators, since the Act of 1776, thus appear before us, we would hardly believe this assembled host from the dead, in how many instances their wills bad been violated. The law then has not prescribed this course of decision.
2. But how far have we bound ourselves, and what have been our decisions on this point ?
As to positive decisions, there are two; Tate v. Tally, 3 Call, 354, and Smith v. Chapman, 1 Hen. & Munf. 240; the first decided in 1803, on a will made in 1777; the other, on a will made in 1790. The point was made and ably argued in both cases; Lyons, Fleming and Roane, being the Judges, with Tucker in addition, in the second.
In Tate v. Tally, Judge Roane was inclined to the opinion, that even if we construed wills of lands made since 1776, in the same manner as wills of personals, it would not have been a good limitation of personal property; but says, “he will not waste time to enquire as to that, being equally clear that it is quite immaterial whether the will was prior to 1776, or since. The Legislative construction of the Act of 1792,” he says, “accords with my opinion on the subject.” (I presume he means the Act of 1785, as incorporated in the Bevised Code of 1792.) “It is entitled to respect, but would not bind the Court to adopt the same construction, contrary to their own judgment, in relation to prior cases f &e.
Fleming, Judge, says, that “as well on general princi-' pies, as on the case of Hill v. Burrow, this was an estate tail in Jesse Tale, prior to the Act of 1776. The question therefore,- is, whether its being made subsequent to that *301 Act lias altered the ease ? And I think not; for the whole effect of that statute is, to convert estates taiHnto estaíoíi in fee simple; and not to alter the meaning of words, or destroy the established rules of construction.” Lyons thought it a clear case of an estate tail; but said nothing on tho point we are now considering. Nor do I understand Judge Fleming as pretending to say, that the Legislature had tied the Courts down to construe a will of a subject which, cannot be entailed, in the same way as of one which can; and this will be entirely manifest by his opinion in Smith v. Chapman, 1 Hen. & Munf. 340, in which caso, also. Judge Roane shews that his opinion in this case, which is the one usually referred to on this subject, does not contain his whole opinion. In Smith v. Chapman, he says, “ Nothing is gained in favor of intention, by construing the limitation to be an estate tail; for it is <-o instanti converted into a fee simple by the general law, of which the testator could not have been ignorant,” &e. The Act of 1778, he says, “cuts up by the roots the pretence of implying an estate tail,” &e. In Tate v. Tally, he says, “The Court concurred in opinion with the Legislature, that in construing what was or was not an estate tail, we should have reference to former laws, and that as to the construction to be made in relation to that point, we should enquire what the law aforetime (that is, before 1776,) was,” &c.' “In a case, however, where the intention of a testator is alleged, under pretext of providing for Ms issue, but in reality to infer an estate which will defeat them, it would seem proper to rebut that allegation by resorting to a posterior general law, without an ignorance of which, it is impossible that any such intention could have existed.” This part of the opinion gives me almost every thing I contend for. The absence of a power to entail lands, according; to it, is a circumstance to be weighed in this Court, when you are called on to infer an estate tail; which therefore, you ought not to do, if you can fairly avoid it, as you thereby *302 gain nothing in favor of intention. You can only create„ in order, eo instanti, to destroy it.
Judge Fleming says, “It appears strange to me, that so much pains have been taken to prove that the devise gave, by implication, an estate tail, which is now, and at the time of making the will had long been, unknown to our laws, that it might be magically turned into an estate in fee, in order to frustrate and defeat the plain intent of the will of the testator.”
Judge Lyons said, “ I shall make short work of all ques tions arising on the construction of wills made since the Act of 1776; so far at least, as it may be necessary to decide whether they meant to pass a fee tail or not. I will not suppose, after that Act, that a man intended to convey an estate tail, (which the law has expressly abolished,) unless plain and unequivocal words are used, such as would, of themselves, create a fee tail, as a devise to Jl. and the heirs of his body, or to «/?. and if he die without issue,” &c.
Judge Tuckee, who also sat in this case, said nothing particularly on this point, and it is therefore presumable that he assented to the doctrines contended for; especially as in parts of his opinion he strongly enforces the duty of searching out and obeying the will of the testator, when that can be done; and as he also concurred with the other Judges on the main question.
It cannot therefore, be maintained, that so far as a deci= sion of this naked question goes, it has at all been decided by this Court, not to take into consideration the inability to entail land as well as personalty, in searching for intent. On the contrary, I consider this a full and decisive case of the question, according with my opinion on that subject.
Has this caser been overruled ? It may be said that it has; because, in many eases, we have recognized the British doctrines, whereby a difference is made between real and personal estate, in a search after intention. Admit this to be the case; what then is the result ? Here is one *303 course of decision which accords even with the British decisions themselves, that where a subject cannot be entailed, you are not to construe a will as you would in relation to a subject that can be entailed. This course of decision accords also with the common sense of all mankind, and is expressly recognized and made a rule of property in future, by the Legislature. Here is also another course of decision by the same Court, running counter to all this; Slaving, as I conceive, a mistaken interpretation of tho Legislative will for its basis, and concerning which all that ean be said is, stare decisis. It is now a canon of property, and if departed from, great mischief will be done. Sales have been made, titles will be broken, &c. &e. ; so that a man who has purchased from me, who, according to our decisions, had a fee tail, will lose the benefit of his purchase, and future dealers will not know how to contract. We must, therefore, continue to take estates from the real owners, and give them to such dealers.
As to the first class, there are few eases, (unless Indeed where a plain estate tail is given, and which, under the Act of 1819, may or may not be a safe subject of sale, according to circumstances,) in which there Is not considerable doubt what will bo the ultimate construction; so that most purchases of this kind are known to be hazardous; and purchasers ought also to know, that our decisions, as to this leading ground of construction, have been always questioned, and decided different ways. Bat, is it better-to persist in error for the benefit of such purchasers, or to retrace our steps ? Suppose the course of decision, &qw indicated by the Legislature, had taken place soon after 1787; or had been considered as settled by tho ease of Smith v. Chapman, as it ought to have been, and persevered in since; could any one have complained ? So far from it, that the Act of 1819 would have been uniiecessary. As to future purchasers, they would have been as much admonished by our decision as by that Act, and would govern themselves accordingly.
*304 But, if the Legislature meant to adopt British constructions on this subject, what class of cases have they adopted; those which relate to subjects that can be entailed, and therefore may be presumed to be so intended; or those which relate to subjects that cannot be entailed, and con- ■ eerning which the presumption fails ? Have they adopted rules of construction drawn from cases strictly analogous, or the reverse ? One is as much law aforetime as the other. Whatever doubts may have existed, and however we may have settled this matter, the Legislature, the whole people speaking through them, have said, that the correct rule of decision is not that which has heretofore been pursued, but the reverse. It is no longer a question, which is the right, and which is the wrong rule of construction. That is decided, and has become a rule of property, by law.
The only question now remaining for us to consider, is, whether we can now throw off the wrong, and lake up the right rule ? If we cannot go back, cannot now re-assert and establish the doctrines laid down in Smith v. Chapman, how can we justify a partial departure from our course of decision, by looking to the Act dispensing with words of inheritance. Judge Roane, who laid down the rule, and is most likely to have known its extent, in Tidball v. Lupton, 1 Rand. 203, speaking even of the Act of descents, says, “We are not at liberty to refer to it; we are confined in our construction, both by the Acts of 1776 and 1785, and by the decisions upon them. All these have referred to the lex temporis, and adopted it,” &c. If we break through the decisions, then, because it is reasonable to do so, as to this matter, do we not shake the foundation of those decisions, and must they not fall at the next touch? I think so; and therefore, if I touch the foundation at all, which I must do if I depart from them in any respect, because it is reasonable that I should do so, (as I think it is in this case,) then I am at once for saying that Smith v. Chapman, gives the law of the land on this subject. I think the necessity of departing from those decisions, in. *305 regard to the application of this part of the Act of 1785 to the case, as well as the clear Legislative enunciation of the correct rule on this question, gives an opportunity, and Indeed call, for au examination of our course on this subjecl, and it will be our own fault if we shall hereafter bo reduced to the dilemma of deciding, that a testal or who made his will on the day before the Act of 1819 was enacted, using the same words with one made on that day, nevertheless intended precisely the reverse of what the latter testator did.
But, it may be said, if all this is granted, if this was personal estate, the limitation over would not bo good; for, the remainder-man will take in fee, under the Act of 1785; and there is therefore, nothing to He it down to a dying without issue living at the death of the first taker. We must, however, recollect, that now there is equally an absence of power to entail lands, as personals, and therefore, it, equally conflicts with intention to infer that one was intended; and that the absence or presence of words of inheritance are equally unimportant, both in case of lauds and personals, as to the quantity of estate really given, whilst their presence or absence equally tend to shew what the testator had in view, as to the time when a contingent ft vent was to happen.
Compare this ease, then, with that of Dunn v. Bray, 1 Call, 338, above mentioned. That was a devise of negroes to TV. B. and his heirs forever; but, in ease he should die and leave no issue, then to C. and his heirs» This was held to mean a dying without issue living at the death of the devisee. It was admitted by Judge Pestd-leton, that if it had been an estate tail in W. B. as was contended, the remainder would be void; since in that case, it would be to take effect on a general failure of issue. He then goes oíi to repel the idea of an entail, in the manner I have before shewn, and says, that Lord Talbot, in Atkinson V. Hutcheson, 3 P. Wms. 258, fully illustrates the. distinction between the devise of an express estate tail and one by *306 implication, as well as the natural meaning oí the words, “ dying without issue,” to wit, at the time of the death.
It is true, that in the case before us, there is neither the word “leave,” nor the word “ then;” but, the devise over in that case was to C. and his heirs, which is wanting in this case; and here, it is to be divided among the surviving brothers, children of the last wife, excluding the children of brothers that, may have died; which shews, in fact, that it was a dying without issue, living some one or more of the brothers, who would take as survivors. This view of the case will even bring it'within that of Pells v. Brown, Cro. Jac. 590; for, if P. Bell had left issue at his death, and brothers also surviving, they never would have taken, although that issue, had become extinct before their deaths. This would also bring it within the cases of Porter v. Bradley, 3 Term Rep. 143, and Roe v. Jeffery, 7 Term Rep. 589.
What is the principle of these cases ? There is, say, a devise to A. and his heirs, but if he die without heirs, then to B. the brother of A. Now here, to die without heirs does not mean without heirs generally, becaus - B, who was to take after A. would be his general heir, if there was none nearer’. The use of the word heirs, therefore, meant the same in both instances in which that word was used, to wit, heirs of the body. This, it has always been said, is a mere matter of construction; and in such a devise, has always been so construed, as will be seen by the cases cited in Pells v. Brown, and other cases. So that, in that case, it would stand as if the devise had been to A. and the heirs of his body, and in case he should die without such heirs, &c. This would make it, as it were, an express estate tail. But very different, as Lord Kenyon says, is the case of a devise to A. and his heirs, and if he die without leaving heirs of his body, then to 2?„ and his heirs. Here is an express fee; and it is not necessary to cut it down to an estate tail, with any view to the issue, for a fee also provides for them. An intention to *307 cut it down must, therefore, manifestly appear, as I understand the au’horities, oven in England; because, hero Is a remainder-man who is evidently an object, as well as the issue. Had the first estate been for life, then, a:> the issue is the primary object, the estate must, be enlarged to an estate tail, or that intent would be defeated; and therefore, the remainder-man must yield to the issue, as in Tale v. Tally, 3 Call, 354. But, when the issue are provided for by the fee in the ancestor, and the remainder man is also an object, which object must bo defeated if you provide for the issue, otherwise than at first contemplated, viz: by chang ing the fee into an estate tail, you must have full warrant for so doing; that is to say, you must dearly see that an indefinite failure of issue was intended. If so, then, in aft-much as it now clearly appears that the intention was to provide for the issue, not by a fee in the ancestor, hut as issue in tail, then the will is to be again construed, as if it had in the first instance been a devise to «4?. and the heirs of his body, and if he die without heirs of his body, &c. | chat appearing now to be the meaning in which the word heirs was at first used.
But, if the subject of file devise be one of which an estate, tail cannot be made, then it will require clear proof indeed; that it was intended to provide for the issue, as zV 3ue in tail, which they could not be; for, to give it this shape, is not done in order to give them any thing, and thereby advance the intent; they get nothing by it. The only effect is, to shew that the testator ignorantly created an estate which could not exist in law; and in consequence of which, his intentions in favor of the remainder-man are defeated. But, having done this, in such plain terms that no other construction can fairly he put on his words, the Court is forced, fay the rules of law, to defeat his intention.
But a limitation over to survivors, as well as the absence or presence of words of inheritance, though otherwise of bo avail, as before said, have affected the construction, i«; many cases.
*308 In Brewer v. Opie, 1 Call, 214, the testator gave his whole and sole estate, real and personal, to his son I. L. and in case he should die before twenty-one, or lawful heir, then his estate to be equally divided between the children of I. B. and L. O. It was held, that I. L. took a contingent fee, (though there were no express words of inheritance,) to become absolute upon either event happening; and as his dying must determine both events, the remainder was good as an executory devise. He died without issue, and under twenty-one years.
Timberlake v. Graves, 6 Munf. 174; Gresham v. Gresham, Ib. 187, on a will dated in 1803; James v. M’Williams and wife, Ib. 301, and Cordle v. Cordle, Ib. 455, on a will dated in 1805, (the Reporter does not give the dates of the wills in the other cases,) are all cases of this description.
On the whole, I incline to think, that the limitation over in this case was good as an executory devise.
Judge Cabell concurred with Judges Cake and Green, and the judgment was aeeiemed.

 The President absent